## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

SUMMER INFANT, INC.,

                Plaintiff,

v.

CAROL E. BRAMSON, ANNAMARIA
DOOLEY, KENNETH N. PRICE,
CARSON J. DARLING, DULCIE M.
MADDEN, and BRUCE WORK,

                Defendants.

Civil Action
No.

**PUBLIC VERSION
REDACTED PURSUANT
TO LR GEN. 102(C)**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

       Plaintiff Summer Infant, Inc. ("Summer" or the "Company"), by its undersigned attorneys, brings this action for temporary, preliminary and permanent injunctive relief, compensatory damages, punitive damages, and an award of attorneys' fees and expenses, and for its Complaint alleges, upon knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

       1.     This action arises out of the brazen, unlawful and intentional theft of Summer's non-public, confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies by several fiduciaries of Summer, including a current director who until very recently was also the Summer Chief Executive Officer, other senior executives of Summer and several former consultants to Summer for the purpose of launching a directly competing business.

       2.     Specifically, Carol E. Bramson, a current Director of Summer and former President and Chief Executive Officer, Annamaria Dooley, who abruptly resigned as Senior Vice

President of Product Development on May 15, 2015, and Kenneth N. Price, current President of Global Sales and Marketing (the "Summer Defendants"), violated their unequivocal contractual obligations and betrayed their fiduciary duties to Summer by conspiring together and with several employees of a technology firm Rest Devices, Inc. ("Rest")—including Dulcie M. Madden (Chief Executive Officer of Rest) and Carson J. Darling (Chief Technology Officer of Rest) (the "Rest Defendants"), whom Summer had paid approximately $500,000 to work on Summer's new products under strict confidentiality agreements—to intentionally steal Summer's confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies and exploit it for their own use to form a new startup company (the "New Startup") to directly compete with Summer in the highly competitive juvenile products industry.

3.      This is the rare case where the co-conspirators—who were duty-bound as fiduciaries to develop exclusively for Summer a new product and business strategy to achieve success for Summer and its shareholders, and are subject to the contractual provision barring additional use of Summer's information—have been caught red-handed memorializing in writing and in meticulous detail their planned theft of intellectual property and identifying the members of their conspiracy to purloin the benefits for themselves. Just days ago, on May 20, 2015, Summer discovered Defendants' wrongful conduct when Dooley sent an email to Bramson, and seemingly inadvertently sent a copy to her former corporate email address at Summer, which Summer monitors to avoid any business disruption after Dooley's recent abrupt resignation. That email exposes Defendants' conspiracy to steal the very heart of Summer's intellectual property:

██████████████████████ (*See* Email dated May 20, 2015 from A. Dooley attaching PowerPoint slide deck titled "████████████████.pptx" (the "New Startup Deck"), attached hereto as Exhibit A.)

     4.     Based on metadata embedded in the New Startup Deck, attached hereto as Exhibit B, the initial version of the New Startup Deck appears to have been created on April 9, 2015, using a Rest computer.  At that time, the Summer Defendants were all still employed by Summer, and the Rest Defendants were all under contract as consultants to Summer.

     5.     Slide 14 of the New Startup Deck prepared by, among others, Dooley (who formerly worked for Summer) and Madden (who works for Rest), describes the proposed management team for the new company that the Defendants are forming, or have already formed, for the express purpose of stealing Summer's intellectual property and usurping its place in the marketplace:



Although the New Startup Deck conspicuously omits the names of the Defendants, no doubt to conceal their identities as long as possible, the descriptions of the individuals make it clear that

the positions of the new company will be held, or are already held, by the following Defendants: (i) Chief Executive Officer: Defendant Carol E. Bramson (a current Summer Director and Summer's former CEO), (ii) Chief Operating Officer: Defendant Bruce Work, (iii) Chief Technology Officer: Defendant Carson J. Darling (Rest's current Chief Technology Officer), (iv) Product Development and Marketing: Defendant Annamaria Dooley (Summer's former Senior Vice President of Product Development), (v) Business Development:  Defendant Dulcie M. Madden (Rest's current Chief Executive Officer), and (vi) Sales Leadership: Defendant Kenneth N. Price (Summer's current President of Global Sales and Marketing).



7.      Because of the highly competitive nature of Summer's business, on top of their fiduciary obligations to Summer, Summer required Bramson, Dooley and Price to execute contractual obligations barring any use or disclosure of Summer's confidential information during and <u>after their employment</u>.

8.      Similarly, the ███████████████████████ and its branding, messaging and marketing have been developed by Summer, using Summer's confidential and proprietary information, intellectual property, and trade secrets, as well as additional work product that Summer owns pursuant to a written Consulting Agreement with Rest, attached hereto as Exhibit C.  Rest was retained by Summer on a highly confidential basis, pursuant to stringent non-disclosure and confidentiality terms, █████████████ ███████████████████.

9.      The Consulting Agreement with Rest expressly states that all intellectual property delivered or made by Rest under the Consulting Agreement is the **"exclusive property of Summer"** and **"work made for hire."**  Pursuant to that Consulting Agreement, Summer owns all work completed by Rest for Summer, including but not limited to: ███████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████

10.      The Defendants—including the Summer Defendants who undertook non-disclosure contractual obligations to Summer and owed Summer fiduciary duties, and the Rest Defendants who performed consulting services for Summer, pursuant to a confidentiality

agreement under which Summer obtained all right and title to the work made for hire—

intentionally and willfully stole ████████████████████████████████████ for

the Defendants' own personal profit.

11.     A side-by-side comparison of a slide from the May 20, 2015 slide

presentation prepared by certain of the Defendants for the New Startup, and a slide from the

earlier February 24–25, 2015 presentation to the Summer Board containing confidential and

proprietary information belonging to Summer (the ████████████████ attached

hereto as Exhibit D), demonstrates Defendants' wholesale theft of Summer's intellectual property

and their plan to introduce that stolen intellectual property to investors and the marketplace:



On its face, a comparison of Defendants' slide with the Summer slide shows the Defendants have brazenly removed the Summer brand names from the New Startup Deck and made other alterations to conceal their theft, but the products and concepts are plainly stolen from Summer. All the products described in the Defendants' slide are products for which Rest provided consulting services for Summer, which under the terms of the Consulting Agreement, are the exclusive property of Summer.  This is just one example of the Defendants' indisputable theft of Summer's confidential and proprietary information, intellectual property, trade secrets, and business, branding, and marketing strategies.

12.     Shockingly, the Defendants did not even go to the trouble of generating a new version of the stolen information contained in slide 10 of the New Startup Deck. Manipulating the PowerPoint elements of slide 10 of the New Startup Deck reveals that <u>the original Summer brand labels are actually hiding behind the new labels in the very same slide</u>:



13.     Another example of the Defendants' blatant theft of Summer's intellectual property can be found by comparing slide 9 of the New Startup Deck with slide 23 of the :



14.     There are many more examples, as discussed below in Paragraphs 100–114.

15.     If that outright theft were not troubling enough, the May 20, 2015 email attaching the infringing slide deck included an email message between Dooley and Bramson that revealed Defendants imminent plan to use this stolen information to raise funds for the New Startup. The May 20, 2015 email references a trip for the specific purpose of presenting the infringing New Startup Deck to potential investors, customers, or strategic partners.

16.     Additionally, Defendants, armed with Summer's stolen proprietary information and trade secrets, are now illicitly attempting to convince current Summer employees to join the New Startup. Defendants' actions further their unlawful scheme to misappropriate Summer's confidential and proprietary information.

17.     To further this illicit objective, the Defendants stole from Summer again—this time stealing a confidential ███████████ analysis that ████████████ ██████, a financial advisory firm, developed pursuant to a paid agreement with Summer (the ███████████████ attached hereto as Exhibit E):





**Defendants' Theft Of Summer's Trade Secrets And Proprietary
And Confidential Information Will Irreparably Harm Summer**

18.     Summer has been and will continue to be irreparably harmed by
Defendants' outright theft of Summer's trade secrets and proprietary and confidential information
if Defendants are allowed to use the stolen information to directly compete against Summer.  A
misappropriation of trade secrets cannot be rectified by money damages.  Once any of the stolen
information is disclosed by Defendants, or employed to create or market competing products,
money damages will not suffice to rectify the harm to Summer.

19.     Separately, in Summer's industry, being first to market with a new product
line is critical.  Defendants' theft places in immediate jeopardy Summer's ability to be first to
bring the ███████████ to the market, which would cause incalculable loss of revenue, loss
of good will, damage to reputation, and loss of business.  If investors, distributors and major
retail chains have doubts about whether Summer is the exclusive owner of the ███████████
███████████—or are falsely lead to believe that they are owned by the
New Startup—Summer's ability to procure financing and orders from distributors and retailers
will be irreparably harmed, placing the continued viability of Summer at immediate risk.  In
addition to losing its critical first-to-market opportunity, Summer will also be irreparably harmed
by damage to the goodwill Summer has painstakingly cultivated over the years with customers,
retailers and industry experts, and by the confusion sowed in the marketplace about Summer's
products.  This harm is compounded by Defendants' plan to use ███████████
███████████ stolen from Summer to raise capital for their illegal
competing New Startup.  Money damages will not suffice to rectify this harm.

20.     In that connection, and further compounding the irreparable and
immediate harm to Summer, Dooley's May 20, 2015 email to Bramson discusses an imminent

"trip" in which Bramson and/or other individuals associated with the New Startup will almost certainly use the New Startup Deck to pitch the stolen ███████████████████████ to outside investors, customers or other potential strategic partners. Dooley also states that she "spoke with Ken [Price] at length and [is] excited at the possibilities."

21.    Further compounding the irreparable and immediate harm to Summer, Dooley met with current Summer employees this Tuesday, May 26, 2015. Defendants, armed with Summer's stolen proprietary information and trade secrets, are now illicitly attempting to convince current Summer employees to join the New Startup. The loss of these employees to the illegal New Startup also constitutes irreparable harm to Summer that money damages will not suffice to rectify. These harms to Summer are all incalculable, substantial, and imminent.

22.    At least two defendants in this action have already agreed that injunctive relief is the appropriate remedy for their actions. Defendant Bramson acknowledged in writing that a breach of her obligations regarding Proprietary Information and Inventions "cannot be reasonably or adequately compensated for in money damages alone and would cause irreparable injury to the Company," and that "the Company is entitled to, in addition to all other rights and remedies . . ., specific performance and immediate injunctive relief, without posting a bond." (Compl. *infra* ¶ 44.) Similarly, Defendant Price acknowledged in writing that "monetary damages would not provide an adequate remedy to Summer" for breach of his agreement with Summer, and that "in addition to any other remedies available to Summer, Summer shall be entitled to seek injunctive and other equitable relief (without having to post bond . . . and without having to prove damages or the inadequacy of available remedies at law) to secure the enforcement" of the Price Agreement. (Compl. ¶ *infra*55.)

23.     Summer learned of Defendants' intentional wrongdoing for the first time last week.

24.     For all these reasons, and the additional reasons set forth below, the Defendants and all persons acting in concert with them should be temporarily restrained, and preliminary and permanently enjoined, from using or disclosing any of Summer's confidential and proprietary information, trade secrets, business strategies, branding strategies, marketing strategies, or technologies, including but not limited to any products or technologies incorporating work performed for Summer by Rest pursuant to the Consulting Agreement (and which Summer exclusively owns).

## PARTIES

25.     Plaintiff Summer Infant, Inc. is a Delaware corporation with its principal place of business located at 1275 Park East Drive, Woonsocket, Rhode Island 02895.

26.     Defendant Carol E. Bramson is an individual who resides at 18 Francis Street, Dover, Massachusetts 02030. Bramson continues to serve as a director on the Company's Board of Directors (the "Summer Board"). Bramson formerly was the Chief Executive Officer of Summer. Bramson's total compensation from Summer for 2014 was more than $450,000, excluding lucrative stock options and other benefits. Bramson is or will be the Chief Executive Officer of the New Startup.

27.     Defendant Annamaria Dooley is an individual who resides at 3 Wight Lane, Westwood, Massachusetts 02090. Until on or about May 15, 2015, Dooley was the Senior Vice President of Product Development for Summer. Dooley was hired by Summer in late 2014, with a total annual compensation package from Summer of $260,000, excluding benefits. On May 15, 2015, Dooley abruptly resigned her position at Summer, and is or will be working in a senior position involved with product development and marketing for the New Startup.

28.     Defendant Kenneth N. Price is an individual who resides at 2226 Noyac Road, Sag Harbor, New York 11963.  Price is currently President of Global Sales and Marketing for Summer.  Mr. Price's total compensation from Summer for 2014 was more than $400,000, excluding lucrative stock options, restricted stock, and other benefits. Price is or will be working in a senior position involved with sales leadership for the New Startup.

29.     Defendant Dulcie M. Madden is an individual who resides at 246 Beacon Street, Apartment 1B, Boston, Massachusetts 02116.  Madden is the Chief Executive Officer of Rest and in her capacity as a Rest employee provided consulting services to Summer relating to ███████████████████, and received confidential and proprietary information relating to it.  Madden is or will be working in a senior position involved with business development for the New Startup.

30.     Defendant Carson J. Darling is an individual who resides at 88 Hancock Street, Apartment 17, Cambridge, Massachusetts 02139.  Darling is the Chief Technology Officer of Rest and in his capacity as a Rest employee provided consulting services to Summer relating to ██████████████ and received confidential and proprietary information relating to it.  Darling is or will be the Chief Technology Officer of the New Startup.

31.     Defendant Bruce Work is an individual who resides at 12 Deer Run, Exeter, New Hampshire 03833.  Work is or will be the Chief Operating Officer of the New Startup.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over this case under 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy in this action exceeds $75,000.

33.     Personal jurisdiction over the Defendants is proper under R.I. Gen. Laws § 9-5-33.

34.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendants solicit, transact, and are doing business within the State of Rhode Island and within this District, and are therefore subject to personal jurisdiction in this District. Further, a substantial portion of the events giving rise to the claims asserted herein occurred in this District.

35.     Personal jurisdiction over Dooley and venue in this District also are proper because Dooley agreed in her employment agreement to "irrevocably submit to and accept the exclusive jurisdiction of the courts in the State of Rhode Island and waive any objection (including any objection to venue or any objection based upon the grounds of forum non conveniens) which might be asserted against the bringing of any such action, suit or other legal proceeding in such courts." (October 29, 2014 Non-Competition, Non-Disclosure and Development Agreement Between Summer and Dooley (the "Dooley Agreement"), attached hereto as Exhibit F.)

36.     Personal jurisdiction over Price and venue in this District also are proper because Price agreed in his employment agreement to "irrevocably submit to and accept the exclusive jurisdiction of the courts in the State of Rhode Island and waive any objection (including any objection to venue or any objection based upon the grounds of forum non conveniens) which might be asserted against the bringing of any such action, suit or other legal proceeding in such courts." (January 13, 2014 Non-Competition, Non-Disclosure and Development Agreement Between Summer and Price (the "Price Agreement"), attached hereto as Exhibit G.)

## FACTUAL BACKGROUND

### Summer Is A Leader In The Premium Juvenile Product Industry

37.     Founded in 1985, Summer is a global leader of premium juvenile products for ages 0–3 years, which are sold principally to large North American and international retailers. Summer is a publicly traded company (NASDAQ: SUMR) that has more than 200 employees worldwide.  For the fiscal year ended January 3, 2015, Summer reported more than $200 million in revenue.

38.     Summer currently sells proprietary products in several different categories, including nursery audio/video monitors, safety gates, durable bath products, bed rails, nursery products, strollers, booster and potty seats, swaddling blankets, bouncers, travel accessories, highchairs, swings, nursery furniture, and infant feeding products.  Summer sells those products under the SwaddleMe®, BornFree®, and Summer® brands, among others.

39.     Summer competes with many established companies in the juvenile products industry.  Like most companies in the juvenile products industry and other highly competitive industries, Summer develops and relies upon trade secrets and proprietary intellectual property for much of its business, and dedicates extensive research and development efforts to the exploration of potential new products, product enhancements, and innovations. Due to the highly competitive nature of the industry, being the first-to-market is crucial.

**To Protect Its Confidential And Proprietary Information,
Intellectual Property, Trade Secrets, And Business, Branding
And Marketing Strategies, Summer Mandates That Its Key
Executives And Other Employees Sign Nondisclosure Agreements**

40.   Because of the highly competitive nature of Summer's business, on top of their fiduciary obligations to Summer, Summer required Bramson, Dooley and Price to execute contractual obligations barring any use or disclosure of Summer's confidential information during and <u>after their employment</u>.  As senior executives at Summer, Bramson, Dooley and Price had almost unfettered access to Summer's most sensitive, confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies.

**Bramson**

41.   Bramson's Employment Agreement dated January 16, 2014 (the "Bramson Agreement") required Bramson to, among other things, keep all nonpublic Summer information and materials confidential both during <u>and</u> after her employment, and <u>not</u> to use utilize such information <u>after</u> her employment with Summer ended:

> The Executive [Bramson] agrees that all information, whether or not in writing, of a private, secret or confidential nature concerning the Company's business, business relationships or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. Without limitation, Proprietary Information shall include inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, development plans, research data, clinical data, confidential communications with regulatory bodies and other third parties, financial data, personnel data, computer programs, customer and supplier lists, and contacts with or knowledge of customers or prospective customers of the Company. The Executive will not disclose any Proprietary Information to any person or entity other than employees of the Company with authorization to access the information or <u>use the same for any purposes</u> (other than in the performance of her duties as an employee of the Company) without approval by an officer of the Company, <u>during or after her employment with the Company</u>, unless and until such Proprietary Information has become public knowledge without fault of the Executive or such disclosure is required by law.

(Bramson Agreement ¶ 5(a), attached hereto as Exhibit H (emphasis added).)

42.     In the Bramson Agreement, Bramson also expressly acknowledged that she had no right, title or interest in any of the inventions or intellectual property developed during her tenure at Summer.  Specifically, Bramson "agree[d] to assign and does hereby assign to the Company (or any person or entity designated by the Company) all of her right, title and interest in and to all Inventions and related patents, patent applications, trade secrets, copyrights and copyright applications."  (*Id.* ¶ 6(b).)  Inventions are "all inventions, improvements, discoveries, methods, developments, software, and works of authorship, whether patentable or not, which are created, made conceived or reduced to practice by her, or under her direction, or jointly with others, during her employment by the Company."  (*Id.* ¶ 6(a).)

43.     Bramson also agreed that upon her termination from Summer, she would return all Summer intellectual property and proprietary information and not retain any such materials or copies thereof:

> The Executive [Bramson] agrees that all files, letters, memoranda, reports, records, data, sketches, drawings, laboratory notebooks, program listings, or other written, photographic, electronic, or other tangible material containing Proprietary Information, in any form, whether created by the Executive or others, which shall come into her custody or possession, shall be the exclusive property of the Company and will be used by the Executive only in the performance of her duties for the Company. All such materials or copies thereof and all tangible property of the Company in the custody or possession of the Executive shall be delivered to the Company, upon the earlier of (i) a request by the Company or (ii) termination of her employment. After such delivery, the Executive shall not retain any such materials or copies thereof or any such tangible property.

(*Id.* ¶ 5(b).)

44.     Bramson also expressly acknowledged and agreed that a breach of her obligations regarding Proprietary Information and Inventions "cannot be reasonably or adequately compensated for in money damages alone and would cause irreparable injury to the Company."  Accordingly, Bramson acknowledged that "the Company is entitled to, in addition to

all other rights and remedies . . ., specific performance and immediate injunctive relief, without posting a bond."

45.    During her employment at Summer, Bramson had continued and unfettered access to considerable critical nonpublic Summer confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies.

**Dooley**

46.    In accepting employment with Summer, Dooley agreed, among other things, to keep all nonpublic Summer information and materials confidential, refrain from using any such information following the termination of her employment and to surrender all such information to Summer immediately upon her termination:

Non-Disclosure of Confidential Information.

a.    Subject to Section 7 [addressing subpoenas] below, Employee [Dooley] will not at any time, whether during or after the termination of his/her employment, reveal to any person or entity any of Summer's Confidential Information, except as may be appropriately required in the ordinary course of performing his/her duties as an employee of Summer. Summer's Confidential Information includes but is not limited to the following non-public information: trade secrets; proprietary formulations generated, developed or licensed by Summer; manufacturing processes, procedures and techniques, material costing, operating margins, details of customer agreements, new product development, expansion strategies, sources of supply, employee compensation, and confidential information of third parties which is given to Summer pursuant to an obligation or agreement to keep such information confidential (collectively, "Confidential Information"). Employee shall keep secret all such matters entrusted to Employee, and Employee shall not use or attempt to use any Confidential Information on behalf of any person or entity other than Summer, or in any manner which may injure or cause loss or may be calculated to injure or cause loss, whether directly or indirectly, to Summer.

b.    Further, Employee agrees that, during his/her employment, Employee shall not make, use, or permit to be used, any notes, memoranda, reports, lists, records, specifications, software programs, data, documentation or other materials of any nature relating to any matter within the scope of the business of Summer or concerning any of its dealings or affairs other than for the benefit of Summer. Employee further agrees that he/she shall not, after the termination of his/her employment, use or permit to be used any

<u>such notes, memoranda, reports, lists, records, specifications, software programs, data, documentation or other materials</u>. All of the foregoing shall be and remain the sole and exclusive property of Summer and, immediately upon the termination of Employee's employment, Employee shall deliver all of the foregoing, and all copies thereof, to Summer at its main office.

(Dooley Agreement ¶ 4 (emphasis added).)

47.     Dooley also agreed to assign all intellectual property developed in the course of her employment to Summer and not keep any such materials or copies thereof:

**Assignment of Inventions.** Employee agrees that he/she will promptly make full written disclosure to Summer, will hold in trust for the sole right and benefit of Summer, and hereby assigns to Summer, or its designee, all Employee's right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, while in the course of his/her employment for Summer during the period of time Employee is in the employ of Summer and relating to the business of Summer (collectively referred to as "Inventions"). Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of Employee's employment with Summer and which are protectable by copyright are "works made for hire," and as such are the sole property of Summer. Employee understands and agrees that the decision whether or not to commercialize or market any Invention developed by Employee solely or jointly with others is within Summer's sole discretion and for Summer's sole benefit and that no royalty will be due to Employee as a result of Summer's efforts to commercialize or market any such Invention.

(*Id.* ¶ 6.a.)

48.     Dooley also agreed that upon her termination from Summer, she would return all Summer property:

**Ownership and Return of Summer's Property.** Employee agrees that on or before Employee's final date of employment with Summer, Employee shall return to Summer all property of Summer in his/her possession, custody or control, including but not limited to, the originals and copies of any information provided to or acquired by Employee in connection with the performance of his/her duties for Summer, such as files, correspondence, communications, memoranda, e-mails, slides, records, technical sheets, and all other documents, no matter how produced or reproduced, all computer equipment, communication devices (including but not

limited to any mobile phone or other portable digital assistant or device), computer programs and/or files, and all office keys and access cards. It is hereby acknowledged that all of said items are the sole and exclusive property of Summer.

(*Id.* ¶ 5.)

49.     Dooley also agreed that upon her termination from Summer, she would not solicit any Summer employee to leave Summer's employ:

> Employee agrees that during the Non-Interference Period, which shall be 12 months following the termination of Employee's employment with Summer for any reason, Employee . . . will not interfere with Summer's relationship with any employee of Summer by: (i) soliciting or communicating with such employee to induce or encourage him or her to leave Summer's employ (regardless of who first initiates the communication); (ii) helping another person or entity evaluate such employee as an employment candidate; or (iii) otherwise helping any person or entity hire an employee away from Summer unless a duly authorized officer of Summer gives Employee written authorization to do so.

(*Id.* ¶ 3.)

50.     Dooley also agreed in Paragraph 8 of the Dooley Agreement that "any such breach or threatened breach [of the Dooley Agreement] may cause irreparable injury to Summer and that money damages may not provide an adequate remedy to Summer."

51.     During her employment at Summer, Dooley had continued and unfettered access to considerable critical non-public Summer confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies.

**Price**

52.     In accepting employment with Summer, Price agreed, among other things, not to use any confidential Summer information during and after his employment and to keep these materials confidential:

> **Confidentiality.** The Executive [Price] acknowledges that in the course of the Executive's employment with Summer, it is expected that the Executive will . . . have knowledge of and access to trade secrets and other proprietary and confidential information of Summer, including, without limitation, the following non-public information: trade secrets, proprietary formulations generated,

developed or licensed by Summer, manufacturing processes, procedures and techniques, material costing, operating margins, details of customer agreements, new product development, expansion strategies, sources of supply, Executive compensation, and confidential information of third parties which is given to Summer pursuant to an obligation or agreement to keep such information confidential or any other information relating to Summer that could reasonably be regarded as confidential or proprietary or which is not in the public domain (other than by reason of Executive's breach of the provisions of this section) (collectively, "*Confidential Information*"). Accordingly, the Executive shall not at any time, either during the time Executive is employed by Summer or thereafter, use or purport to authorize any Person to use, reveal, report, publish, transfer or otherwise disclose to any Person, any Confidential Information without the prior written consent of Summer . . . . The Executive shall keep secret all such matters entrusted to Executive, and Executive shall not use or attempt to use any Confidential Information on behalf of any person or entity other than Summer, or in any manner which may injure or cause loss or may be calculated to injure or cause loss, whether directly or indirectly, to Summer.

Further, Executive agrees that, during his employment, Executive shall not make, use, or permit to be used, any notes, memoranda, reports, lists, records, specifications, software programs, data, documentation or other materials of any nature relating to any matter within the scope of the business of Summer or concerning any of its dealings or affairs other than for the benefit of Summer. Executive further agrees that he shall not, after the termination of his employment, use or permit to be used any such notes, memoranda, reports, lists, records, specifications, software programs, data, documentation or other materials. All of the foregoing shall be and remain the sole and exclusive property of Summer, and immediately upon the termination of Executive's employment, Executive shall deliver all of the foregoing, and all copies thereof, to Summer at its main office.

(Price Agreement ¶ 3(a) (emphasis added).)

53.   Price also agreed to assign all intellectual property developed in the course

of his employment to Summer:

**Assignment of Inventions.** Executive agrees that he will promptly make full written disclosure to Summer, will hold in trust for the sole right and benefit of Summer, and hereby assigns to Summer, or its designee, all Executive's right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which Executive may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, while in the course of his employment for Summer during the period of time Executive is in the employ of Summer and relating to the business of Summer (collectively

referred to as "Inventions"). Executive further acknowledges that all original works of authorship which are made by Executive (solely or jointly with others) within the scope of and during the period of Executive's employment with Summer and which are protectable by copyright are "works made for hire," and as such are the sole property of Summer. Executive understands and agrees that the decision whether or not to commercialize or market any Invention developed by Executive solely or jointly with others is within Summer's sole discretion and for Summer's sole benefit and that no royalty will be due to Executive as a result of Summer's efforts to commercialize or market any such Invention.

(*Id.* ¶ 3.(e).)

54.     Price also agreed that upon his termination from Summer, he would not solicit any Summer employee to leave Summer's employ:

**Non-Interference.** During the Executive's employment with Summer and thereafter during the Restricted Period [which "means the one (1) year period of time after termination of the Executive's employment with Summer, for whatever the reason of such termination (*id.* ¶ 2)], the Executive shall not, interfere with Summer's relationship with its Business Partners by soliciting or communicating (regardless of who initiates the communication) with a Business Partner to induce or encourage the Business Partner to stop doing business or reduce its business with Summer, unless a duly authorized officer of Summer gives Executive written authorization to do so. Executive also agrees that during the Non-Interference Period, he will not work on a Summer account on behalf of a Business Partner or serve as the representative of a Business Partner for Summer. During the Restrictive Period, Executive also will not interfere with Summer's relationship with any employee of Summer by: (i) soliciting or communicating with such employee to induce or encourage him or her to leave Summer's employ (regardless of who first initiates the communication); (ii) helping another person or entity evaluate such employee as an employment candidate; or (iii) otherwise helping any person or entity hire an employee away from Summer unless a duly authorized officer of Summer gives Executive written authorization to do so.

(*Id.* ¶ 3.(c).)

55.     Price also acknowledged in Paragraph 4 of the Price Agreement that "monetary damages would not provide an adequate remedy to Summer" for breach of the Price Agreement. Accordingly, Price "agree[d] that, in addition to any other remedies available to Summer, Summer shall be entitled to seek injunctive and other equitable relief (without having

to post bond . . . and without having to prove damages or the inadequacy of available remedies at law) to secure the enforcement" of the Price Agreement.

56.     During his employment at Summer, Price had continued and unfettered access to considerable critical non-public Summer confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies.

**Summer Implements Other Measures To Protect Its**
**Confidential And Proprietary Information, Intellectual Property,**
**Trade Secrets And Business, Branding And Marketing Strategies**

57.     Summer took rigid steps to keep its confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies safe, including but not limited to:  the use of strong passwords that expire every 90 days, encryption, required non-disclosure agreements, and physical access restrictions to the building.

58.     In addition, Summer also requires that third parties and vendors sign nondisclosure agreements where appropriate.

**Bramson Retains Rest Devices, Inc. As A Consultant In Connection**
**With Summer's Development Of** ███████████████████████

59.     Since the fall of 2014, Summer has been investing considerable time and resources developing ███████████████████████████████████████████████████████████████████████████ is unlike any other product offering currently available in the market place today, and ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



60.   In furtherance of the [REDACTED], Bramson retained Rest on behalf of Summer as a consultant to act as its agent to assist Summer in [REDACTED] To ensure confidentiality from the outset, on December 1, 2014, Summer entered into a Mutual Confidentiality and Non-Disclosure Agreement.

61.   Subsequently, on February 1, 2015, Summer entered into the Consulting Agreement with Rest pursuant to which Summer agreed to pay Rest a monthly consulting fee of $155,000.  Summer satisfied all of its obligations under the Consulting Agreement.

62.   To confirm and ensure Summer's indisputable ownership of all intellectual property related to [REDACTED] in the Consulting Agreement, Rest "absolutely and irrevocably transfer[red] and assign[ed] to Summer all of [Rest's] right, title and interest in the Products and the Intellectual Property" and Rest further "acknowledges Summer's sole and exclusive ownership of the Products" (subject to Rest's rights in certain intellectual property for which Summer was to be granted a royalty-free exclusive license).  (Consulting Agreement § 3.1)  Rest also agreed that all intellectual property delivered or made by Rest under the Consulting Agreement would be the **"exclusive property of Summer"** and delivered **"work made for hire."**  (*Id.* § 3.2.)  A work made for hire is a work where the person it was made for

(in this case Summer) is considered to be the owner instead of the person performing the work (in this case Rest).

63.     Rest further agreed to "use its best efforts to faithfully and in a first-class manner research, develop, refine, commercialize and further enhance" certain Summer Products related to ▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* § 1.1.)  The Consulting Agreement defined the term Products to mean the "Products set forth on <u>Exhibit A</u> hereof together with any subsequent additions mutually agreed to by the parties." (*Id.* § 2.1.)

64.     Exhibit A to the Consulting Agreement set forth "specific objectives" and "products" to be developed for Summer.  These products, which are all integrated components of the ▮▮▮▮▮▮▮▮▮▮, included but are not limited to:

(a)



(b)

(c)

(d)

(e)

(f)

(g)



65.     Accordingly, under the unambiguous terms of the Consulting Agreement, all Products "research[ed], develop[ed], refine[d], commercialize[d] [or] further enhance[d]" pursuant to the Consulting Agreement were the sole proprietary and confidential property of Summer, and neither Rest nor any other entity had any right to these Products.

66.     The Consulting Agreement also required all Rest employees to execute
"confidentiality agreements with respect to the Products, Services and developments hereunder
and [each employee] shall also have fully and irrevocably assigned to [Summer] all of its
inventions, copyrights, patents and other intellectual property rights in, to and under the Products
including all incidental and related intellectual property, know-how, proprietary information and
the like." (*Id.* § 1.5.)

67.     The Consulting Agreement was executed by Bramson and Madden as
CEOs of Summer and Rest, respectively.

68.     Through these agreements with Rest, Summer obtained assurances that
Summer's confidential and proprietary information, intellectual property, trade secrets, and
business, branding and marketing strategies would remain protected.  In reliance on those
agreements, Summer disclosed to Rest Summer's most sensitive, confidential and proprietary
intellectual property, trade secrets, and business, branding and marketing strategies concerning
██████████████████████, including its marketing, financial and competitive strategies to
enable Summer to succeed, including its strategy to be first in the marketplace with ████████
████.  In addition, through these agreements with Rest, Summer obtained all right, title and
interest to the Products and Services developed and completed under the Consulting Agreement.

**During The Spring 2015, Summer Continued To
Develop Its Proprietary** ██████████████████████

69.     During 2014 and 2015, Summer expended millions of dollars and
enormous resources in developing ██████████████████.  These efforts included
contacting numerous firms to explore partnerships, leading to the Consulting Agreement with
Rest.  These efforts also included ████████████████████████████████

developed under the Consulting Agreement.  Given the importance of these initiatives, the

Summer Board received regular updates and presentations.

70.     For example, in their capacity as senior executives at Summer, Bramson

and Dooley created a highly confidential and proprietary presentation entitled "Summer Infant—

Rest Devices Strategic Opportunity" (the "Summer/Rest Presentation"), attached hereto as

Exhibit I.  On February 8, 2015, Bramson emailed the presentation to Dan Almagor, the

Chairman of the Summer Board, and stated that the Consulting Agreement had resulted in

"tremendous progress and a very positive collaborative effort on the part of . . . Summer and

Rest."

71.     On February 24 and 25, 2015, Bramson presented to the Summer Board a

highly confidential and proprietary presentation titled "Summer Infant—Strategic Vision for

2016 & Beyond" (the " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ).  The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

outlined Summer's new product offering, ▮▮▮▮▮▮▮▮▮▮▮▮▮—new products that

had never been disclosed to the public.

72.     The ▮▮▮▮▮▮▮▮▮▮▮▮contains highly confidential and

proprietary information to which Summer restricted access.  The Summer/Rest Presentation and

▮▮▮▮▮▮▮▮▮▮▮ further detailed highly confidential information about the

▮▮▮▮▮▮▮▮▮▮ product.  Among other things, those confidential and proprietary

presentations explained the development of ▮▮▮▮▮▮▮▮▮▮ and detailed Summer's

plans to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮  Those presentations also detailed Summer's confidential business plans to

leverage its industry knowledge and connections to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Under the unambiguous terms of the Consulting Agreement, Summer possessed "sole and exclusive ownership" of these Products, intellectual property and proprietary business plans.

73.     These presentations further explained the analytics functions of the ▉▉▉▉▉▉▉▉▉▉▉ Using the various products in the ▉▉▉▉▉▉ Summer planned to market a product that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ Under the unambiguous terms of the Consulting Agreement, Summer possessed "sole and exclusive ownership" of these Products, intellectual property and proprietary business plans.

74.     On March 26, 2015, Madden, on behalf of Rest, emailed Bill Mote, Summer's Chief Financial Officer, and Ted Klowan, Summer's Vice President of Finance, a "product update presentation" dated March 25, 2015.  The March 25, 2015 status update outlined the progress on the deliverables for "Summer's new product lineup." (Exhibit J at 3 (emphasis added).)  Among other things, this update outlined the work that had been completed and the remaining work to be done on the "major deliverables" associated with the ▉▉▉▉▉▉▉



. Specifically, the outline stated the Summer/Rest team had

Under the unambiguous terms of the Consulting Agreement, Summer possessed "sole and exclusive ownership" of these Products, intellectual property and proprietary business plans (subject to Rest's rights in certain intellectual property for which Summer was to be granted a royalty-free exclusive license).

75.    In addition, Rest performed work for Summer on all of the following items:

Under the express terms of the Consulting Agreement, all of that work is solely and exclusively the property of Summer, and any other use of that property is outright theft.

**As** ▮▮▮▮▮▮ **Product Neared Completion, Summer Obtained Highly Confidential And Proprietary** ▮▮▮▮ **Advice That Was Not Publicly Disclosed**

76.    As part of a paid agreement with ▮▮▮▮ prepared a presentation for the Summer Board regarding

██████████████████████ On February 25, 2015, Summer invited ████ to present its findings to the Summer Board.  During the presentation, ████ discussed with the Summer Board ██████████████████ and how it could best be utilized to advance Summer's competitive position. ████████████████ was attended by the entire Summer Board, Mote, Summer's outside counsel, and representatives of ████

<blockquote>77.  ████████████████████████████████████████████████████████████████████████████████ This is highly confidential information that Summer would never share with a competitor. ████████████████████████████████████████████</blockquote>

<blockquote>78.  Summer and ████ implemented several measures to maintain the confidentiality of the ████████████. The ██████████ was <u>not</u> made available electronically and only hard copies were available at the meeting.  The directors were asked to return the hard copies of the ██████████ after the meeting, so that no director would leave the meeting with a hard copy of the presentation.  Additionally, every page of the ████ ████████ includes a prominent "Confidential—Do Not Copy" warning in red text and surrounded by a red box, and the ████████████ used a code name ████████ to refer to Summer.</blockquote>

<blockquote>79.  On April 1, 2015, Almagor sent Bramson a copy of the ████████████ via email and directed Bramson to "[p]lease keep [the ██████████ super confidential for you only."  Bramson responded "Will do. Thank you."</blockquote>

**In Early 2015, Bramson Is Replaced As President By Director Bob Stebenne
And Bramson Subsequently Resigned As Summer's Chief Executive Officer**

80. By early 2015, it became apparent to the Summer Board that Bramson, whose background was in finance, lacked the operating experience needed to spearhead the Company's new initiatives, including ███████████████████. Accordingly, the Summer Board installed Bob Stebenne, a Summer director and former President of New Business Development for Hasbro Industries, to serve as President. At that time, Bramson continued to serve as Chief Executive Officer.

81. Prior to May 5, 2015, Almagor had conversations with Bramson concerning her future involvement with Summer. During these conversations, Almagor discussed a potential transition including Bramson's departure and inquired into her relationship with Rest. Bramson initially declined to respond to Almagor's inquiry, but at the end, she assured Almagor that she had no plans on working with Rest. On May 5, 2015, on the morning of a meeting of the Summer Board, Bramson abruptly resigned as Chief Executive Officer of Summer citing alleged "recent changes in senior management" and "the lack of information regarding management decisions and activities at the Board level." Bramson did not resign her position as a Director of Summer and continues to hold that position.

82. In reality, as Summer would later learn, the true reason for Bramson's abrupt resignation and failure to answer Almagor's inquiry about her relationship to Rest was to facilitate the ongoing conspiracy to form a new competing company and steal Summer's confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies to use in her new, competing company.

**Price Expressed His Intention To Leave Summer**

83.     On or about April 27, 2015, Price, through his attorney, sent a letter to Summer's Chairman of the Board stating that Price purportedly has "reason to trigger a Good Reason resignation" from Summer.  In that letter, Price cited as the "Good Reason" (as that term is defined in the Price Agreement) the fact that Summer hired Stebenne (who is currently President, Chief Executive Officer, and member of the Summer Board) to replace Bramson (formerly the President and Chief Executive Officer, and currently a member of the Summer Board), and therefore there allegedly was a "new reporting structure" and "material diminution" in Price's "authority, duties or responsibilities."

84.     On its face, Price's Good Reason letter was a pretextual attempt by Price to voluntarily resign from Summer and still collect the severance payments available under the Price Agreement only if certain conditions were satisfied.  In reality, as Summer would later learn, the true reason for Price's resignation was so that he could join the ongoing conspiracy (involving Bramson, other former Summer senior executives and Rest executives) to form a new competing company using confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies stolen from Summer.

**Dooley Resigned From Summer**

85.     On or about April 18, 2015, Dooley initially expressed her intention to resign from Summer.  In an email communication with Almagor, Dooley identified several items that she would like to see changed, including a change in her reporting relationship and a

██████████████████████████

86.     In a letter dated May 6, 2015 from Dooley addressed to Stebenne, Dooley stated she had resigned from Summer due to the "recent pressures of work/family balance have dictated that I create a transition plan and exit my role."

87.     On or about May 15, 2015, Dooley resigned from Summer.

88.     Dooley's first proffered justification for resigning (which included her reporting relationship) and her second proffered justification for resigning (the "work/family balance") were designed to cover up the true reason for her resignation. As Summer would later learn, the real reason for Dooley's resignation was to facilitate the ongoing conspiracy (involving Bramson, other former Summer senior executives and Rest executives) to form a new competing company using confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies stolen from Summer.

**In May 2015, Rest Refused To Comply With The Consulting Agreement And Refused To Continue Providing Consulting Services**

89.     On April 29, 2015, Summer exercised its option to extend the Consulting Agreement for several additional months, which "Summer, in its sole discretion" was contractually entitled to do "subject to Rest's consent not to be unreasonably withheld or delayed."

90.     On May 4, 2015, Madden, on behalf of Rest, notified Summer that Rest would not comply with the Consulting Agreement and would not consent to an additional term because continuing the relationship with Summer was "not the best use of our time."

91.     On May 8, 2015, Summer informed Rest via email that Rest did not provide "reasonable basis for refusing to consent" to an extension of the Consulting Agreement. Later on May 8, 2015, Rest responded to Summer's email and alleged that Rest had "completed each of the deliverables listed" in the Consulting Agreement, and "it really wouldn't be worth Summer's time to extend the agreement."

92.     On May 12, 2015, Summer responded by requesting an in-person meeting between Summer and Rest.  On May 14, 2015, Summer (represented by Almagor and Stebenne)

and Rest (represented by Madden, Darling and Thomas Lipoma, another Rest executive) held a teleconference. While Summer renewed its desire to exercise its contractual right to an extension of the Consulting Agreement, Summer suggested it could be creative with how the arrangement could work moving forward. Rest was adamant that it could not move forward because of the investors it had chosen.

**Summer Learned Several Summer Senior Executives And Rest Employees Were Secretly Conspiring To Form A New Startup And Steal Summer's Confidential And Proprietary Information, Intellectual Property, Trade Secrets, And Business, Branding And Marketing Strategies**

93.     Defendants' scheme to steal Summer's invaluable intellectual property, trade secrets and confidential information only came to light days ago as a result of Summer's routine monitoring of Dooley's work email account (adooley@summerinfant.com) to avoid business disruptions, which revealed a highly incriminating email Dooley seemingly inadvertently sent to her Summer email address.

94.     On May 20, 2015 at 10:52 p.m., Dooley sent an email (the "Dooley email") with the subject line "Fwd: ███████████ " from her personal rollerderby1121@gmail.com email account to her adooley@summerinfant.com email account.

95.     The Dooley Email forwarded another email Dooley had sent earlier that evening on May 20, 2014 at 9:44 p.m. from her personal rollerderby1121@gmail.com email account to Bramson's personal cbramson@tbgcapital.com email account. That 9:44 p.m. email attached a PowerPoint slide deck titled "██████████████.pptx" and stated:

> In my head I hear Dulcie [Madden]'s voice - 'there's a crapton of information'
>
> I've made some edits. I'll take another look in the morning with a fresh set of eyes.
>
> I added a slide which provides the 'walk' - it's a talk to slide where you can show how ████████████████████████

Let me know what you think

I'd love to come on the trip provided you think it would be of value at this stage.

I'll also start a similar 'vision' deck for the ███████████ I spoke with Ken [Price] at length and am excited at the possibilities. In many respects many of the███████████████████ could be 'pivoted' and marketed to ███████

More to follow.


Anna

(*See* Exhibit A.)

96.     The New Startup Deck is comprised almost exclusively of confidential and proprietary Summer information, developed under the Consulting Agreement and wrongfully stolen from Summer without Summer's knowledge or permission. The New Startup Deck includes Summer's confidential and proprietary information stolen from the███████ ████████████ confidential ██████████████████, and proprietary information developed under the Consulting Agreement.

97.     Based on metadata embedded in the New Startup Deck, the initial version of the New Startup Deck appears to have been created on April 9, 2015, using a Rest computer. At that time, the Summer Defendants were all still employed by Summer, and the Rest Defendants were all under contract as consultants to Summer. Summer has not been able to determine how many times the New Startup Deck has been modified.

98.     The New Startup Deck is a PowerPoint investors' pitch for the New Startup, which would develop and sell ████████████████

99.     Acknowledging the direct involvement of each of the Defendants in the illegal conspiracy to steal Summer's intellectual property, the New Startup Deck lists the key employees in the New Startup:

# team

**Chief Executive Officer**
Experienced Chief Executive Officer, Director of Private and Public Companies and Seasoned Private Equity Investor with over 25 years of experience working with growth companies in a variety of industries. Successful track record of building new companies through acquisition, consolidation and strategic positioning. Founder of White Cloud Nutrition, Quest Specialty Chemicals, Sovereign Specialty Chemicals, Former Partner First Chicago Equity Capital. Holds a BS in Finance (with honors) from DePaul University and an MBA from The University of Chicago Booth School of Business.

**Chief Financial Officer**
Chief Financial Officer with experience at a number of fortune 100 companies. Demonstrated proficiency in finance, treasury, investor relations, risk management, mergers and acquisitions, tax, audit, financial planning and analysis. She holds a BS degree from the University of Illinois and an MBA from the University of Chicago Booth School of Business.

**Chief Operating Officer**
Customer first operator's executive recognized for outstanding bottom line results. Exceptional record of exceeding business targets and delivering sustainable performance. COO experience in a variety of industries including apparel, sporting goods, software, and retail in organizations ranging in size from startup to $5 billion. He holds a BA in Economics from Princeton University and an MBA from The University of Michigan Ross School of Business.

**Chief Technology Officer(s)**
Currently a leader in the connected product space, with 10+ patents filed and under development. Ability to grow and lead teams in both the hardware and software spaces, with a user-centered, innovator-driver focus. Degree from MIT in Mechanical Engineering and Computer Science.

**Product Development and Marketing**
Seasoned product development and innovation leader who has led $200M+ product companies through significant product and brand equity growth. Held EVP level positions at 3 consumer products companies. BA in Economics from Harvard University.

**Business Development**
Growth-oriented professional with 10 years of demonstrated leadership showing growth via partnership and revenue generation opportunities. Clear focus on building and extending bottom line while actively seeking new revenue opportunities and product-oriented collaborations. BS degree from Georgetown University and an MBA from the MIT Sloan School of Business.

**Sales Leadership**
Accomplished executive with over 30 years of Sales and Marketing experience with a focus on juvenile and toy categories. He has grown businesses from $130 million to $1.0 Billion and has earned every major retailer supplier award. He holds a BA in Business Administration and Management from SUNY Albany and an MBA in Marketing from Hofstra University.

That team includes:

(a)     CEO (Defendant Bramson):  The CEO is described as having "over 25 years of experience working with growth companies in a variety of industries. . . . Former Partner First Chicago Equity Capital.  Holds a BS in Finance (with honors) from DePaul University and an MBA from The University of Chicago Booth School of Business."  Bramson's former Summer biography says "[s]he has more than 25 years of experience building strong businesses in a variety of industries. . . . [She] joined Banc One Equity Capital (formerly First Chicago Equity Capital) . . . where she became a Partner . . . . She holds a B.S. in Finance (with honors) from DePaul University and an MBA from The University of Chicago."

(b)    COO (Defendant Work): The COO is described as having "experience in a variety of industries including apparel, sporting goods, software, and retail . . . . He holds a BA in Economics from Princeton University and an MBA from The University of Michigan Ross School of Business." The New Startup's COO is Work. On Work's Linkedin page, he indicates he worked at Hanes, an apparel company, Performance Sports Group and Easton-Bell Sports, sporting goods companies, Compliance Networks, a software company, and Linens N Things, a retailer. He claims he received degree in economics from Princeton University and an Executive MBA at "University of Michigan—Stephen M. Ross School of Business." On May 20, 2015, Bramson—without knowledge of Almagor, Stebenne, or the Senior Vice President of Human Resources—brought Work to Summer's office to meet Dooley.

(c)    CTO (Defendant Darling):  The CTO is described as "lead[ing] teams in both the hardware and software spaces. . . . Degree from MIT in Mechanical Engineering and Computer Science." The New Startup's CTO is Darling, the current CTO of Rest. In the Madden status update presentation to Summer dated March 25, 2015, Darling is described as having "[b]uilt ground-to-launch electronics . . . [and] led development of iOS app." He is further described as having "MIT CS + MechE."

(d)    Product Development and Marketing (Defendant Dooley):  The head of product development and marketing is described as having "[h]eld EVP level positions at 3 consumer products companies.  BA in Economics from

Harvard University."  The New Startup's head of product development and marketing is Dooley.  On Dooley's Linkedin page, she indicates she was "EVP Marketing" at Hasbro and "Acting CEO/General Manager" of Primavera, a "multi million dollar hospitality company."  Additionally, Dooley was a Senior Vice President at Summer.  On her Linkedin page, Dooley claims she received a "BA, Economics" from Harvard University.

(e)  Business Development (Defendant Madden):  The head of business development is described as having a "BS degree from Georgetown University and an MBA from the MIT Sloan School of Business."  The New Startup's head of business development is Madden.  In the Madden presentation to Summer dated March 25, 2015, Madden is described as having a "BS, Georgetown; ½ MBA MIT Sloan."

(f)  Sales Leadership (Defendant Price):  The head of sales leadership is described as having "a BA in Business Administration and Management from SUNY Albany and an MBA in Marketing from Hofstra University."  The New Startup's head of sales leadership is Price.  According to Price's Summer biography, he "earned a Master's Degree in Business Administration, Marketing from Hofstra University and his Bachelor's Degree in Business Administration and Management from SUNY Albany."

100.  The New Startup Deck includes ███████████████████ ██████ that was stolen from the ████████████████



101. This schematic  The schematic and

were developed for Summer under the Consulting

Agreement, pursuant to which Summer retains "sole and exclusive ownership" of the schematic.

The New Startup Deck's schematic also shows that the New Startup plans to market products

covered by the Consulting Agreement, including but not limited to

These products were developed for Summer under the

consulting agreement, pursuant to which Summer retains "sole and exclusive ownership" of

these products (subject to Rest's rights in certain intellectual property for which Summer was to

be granted a royalty-free exclusive license).

102.     Shockingly, the Defendants did not even go to the trouble of generating a
new version of the stolen information contained in slide 10 of the New Startup Deck.
Manipulating the PowerPoint elements of slide 10 of the New Startup Deck reveals that <u>the
original Summer brand labels are actually hiding behind the new labels in the very same slide</u>:



103.     Additionally, this slide stole portions of the accompanying text from the
███████████████████████████████████████████████████ The New Startup
Slide states that the ████████████████████ (New Startup Deck slide 10.)

104. It is obvious that Defendants have stolen Summer's intellectual property, confidential business plans and trade secrets. Defendants unambiguously intend to market products incorporating Summer's stolen property, which would substantially and irreparably harm Summer.

105. Slide 9 of the New Startup Deck also steals the description of ███████ ████████████ nearly verbatim and uses a substantially identical graphical presentation as the one included in the ███████████████████████. Again, the New Startup Deck unabashedly removes references to Summer's trademarks in an attempt to cover up Defendants' blatant theft:



106.   Slide 9 of the New Startup Deck steals the ████████████████

███ wholesale.  The interconnected parts of this █████ were developed by and for

Summer under the express terms of Exhibit A of the Consulting Agreement, which covers the

████████████████████████████████████ Pursuant to the

Consulting Agreement, Summer retains "sole and exclusive ownership" of this ████████

██████████ Defendants unambiguously intend to market a ██████████

incorporating Summer's stolen property, which would substantially and irreparably harm

Summer.

107.   The illicit theft and modifications on slide 9 of the New Startup Deck

include, but are not limited to:



(a)   ████████████████████████████████

The New Startup Deck removes reference to Summer

products in a blatant attempt to cover up Defendants' theft.

(b)   ████████████████████████ New Startup

Deck: ████████████████████████

(c)   ████████████████████████ New Startup

Deck: ████████████████████████

(d) 

New Startup
Deck:

New Startup Deck removes reference to Summer in a blatant attempt to cover up Defendants' theft.

(e)

New Startup Deck:

(f)

New Startup Deck:

(g)

New Startup Deck:

108.   As another example, slide 8 of the New Startup Deck contains a chart describing the [redacted] that was stolen from the [redacted] [redacted]



109.    In another blatant attempt to cover up Defendants' theft of Summer's property, slide 8 of the New Startup Deck removes references to Summer's ███████ product.

110.    Slides 17 and 19 of the New Startup Deck contain charts of ███████ ████████████████████ and ██████████████████████ The New Startup Deck stole these charts from the ██████████ proprietary and confidential information produced under Summer's financial relationship with ████





111.    The New Startup Deck's charts have substantively identical titles as their ███████████ counterparts. The bottom of the New Startup Deck's ███████████ (slide 17) reads ███████████████████████████ the same as its ███████████ counterpart (slide 19). The footnote of the New Startup Deck's ███ ███ (slide 19) reads ████████████████████ the same as its ███ ███ counterpart (slide 22). The bottom of the chart also reads ███████ ███████████ which is nearly identical to its ███████████ counterpart. Defendants changed ███████████████████ to ███████████████████ in an attempt to cover up their theft of Summer's confidential information.

112.    Additionally, slide 5 of the New Startup Deck depicts ███████ ███████████ using virtually identical pie charts with the same colors, shapes and financial information. The New Startup Deck stole the ███████████ from slide 6-2 of an earlier February 24–25, 2015 presentation by Dooley to the Summer Board, attached hereto as Exhibit K:



113.    These illustrative examples—and they are only illustrative, there are more—demonstrate the Defendants' outright theft of Summer's confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies. The New Startup Deck also steals additional information from other Summer presentations and plans.

114.    In her May 20, 2015 email, Dooley states that she "made some edits" to the New Startup Deck and "added a slide which provides the 'walk' – it's a talk to slide where you can show how ████████████████████████████████████████████ Summer believes this slide is slide 10 of the New Startup Deck, which stole the very design of the ████████████████████

**Defendants' Theft Of Summer's Trade Secrets And Proprietary**
**And Confidential Information Will Irreparably Harm Summer**

115.    Summer has been and will continue to be irreparably harmed by Defendants' outright theft of Summer's trade secrets and proprietary and confidential information if Defendants are allowed to use the stolen information to directly compete against Summer.  A misappropriation of trade secrets cannot be rectified by money damages.  Once any of the stolen information is disclosed by Defendants, or employed to create or market competing products, money damages will not suffice to rectify the harm to Summer.

116.    Separately, in Summer's industry, being first to market with a new product line is critical.  Defendants' theft places in immediate jeopardy Summer's ability to be first to bring ████████████ to the market, which would cause incalculable loss of revenue, loss of good will, damage to reputation, and loss of business.  If investors, distributors and major retail chains have doubts about whether Summer is the exclusive owner of ████████████

███████████████████—or are falsely led to believe that they are owned by the

New Startup—Summer's ability to procure financing and orders from distributors and retailers

will be irreparably harmed, placing the continued viability of Summer at immediate risk. In

addition to losing its critical first-to-market opportunity, Summer will also be irreparably harmed

by damage to the goodwill Summer has painstakingly cultivated over the years with customers,

retailers and industry experts, and by the confusion sowed in the marketplace about Summer's

products. This harm is compounded by Defendants' plan to use ███████████ stolen

from Summer to raise capital for their illegal competing New Startup. Money damages will not

suffice to rectify this harm.

117.    In that connection, and further compounding the irreparable and

immediate harm to Summer, Dooley's May 20, 2015 email to Bramson discusses an imminent

"trip" in which Bramson and/or other individuals associated with the New Startup will almost

certainly use the New Startup Deck to pitch the stolen ██████████████ to

outside investors, customers or other potential strategic partners. Dooley also states that she

"spoke with Ken [Price] at length and [is] excited at the possibilities."

118.    Further compounding the irreparable and immediate harm to Summer,

Dooley arranged to meet with current Summer employees this Tuesday, May 26, 2015.

Defendants, armed with Summer's stolen proprietary information and trade secrets, are now

illicitly attempting to convince current Summer employees to join the New Startup. The loss of

these employees to the illegal New Startup also constitutes irreparable harm to Summer that

money damages will not suffice to rectify.

119.    At least two defendants in this action have already agreed that injunctive

relief is the appropriate remedy for their actions. Defendant Bramson acknowledged in writing

that a breach of her obligations regarding Proprietary Information and Inventions "cannot be reasonably or adequately compensated for in money damages alone and would cause irreparable injury to the Company," and that "the Company is entitled to, in addition to all other rights and remedies . . . , specific performance and immediate injunctive relief, without posting a bond." (Compl. *supra* ¶ 44.)  Similarly, Defendant Price acknowledged in writing that "monetary damages would not provide an adequate remedy to Summer" for breach of his agreement with Summer, and that "in addition to any other remedies available to Summer, Summer shall be entitled to seek injunctive and other equitable relief (without having to post bond . . . and without having to prove damages or the inadequacy of available remedies at law) to secure the enforcement" of the Price Agreement.  (Compl. *supra* ¶ 55.)

120.   Summer learned of Defendants' intentional wrongdoing for the first time last week.

**COUNT I**
**VIOLATION OF UNIFORM TRADE SECRETS**
**ACT UNDER RI GEN. LAWS §§ 6-41-1 *ET SEQ.***
(Against All Defendants)

121.   Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

122.   The ███████████████ and its constitutive confidential and proprietary information, intellectual property, and business, branding and marketing strategies are trade secrets because they do not exist in the public domain, and derive independent economic value from not being generally known to, and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure.

123.   Summer takes reasonable steps to maintain the secrecy of its trade secrets.

124.    Defendants were familiar with and given access to Summer's trade secrets regarding ███████████████████

125.    Defendants have misappropriated trade secrets through improper means, including but not limited to theft, misrepresentation, breach or inducement of breach of a duty to maintain secrecy, and espionage through electronic or other means. These trade secrets include, but are not limited to:



126.    As a direct and proximate result of Defendants' misappropriation of trade secrets through improper means, Summer has suffered and will continue to suffer irreparable harm.

127.    Defendants' conduct constitutes willful and malicious misappropriation of Summer's trade secrets.

## COUNT II
## MISAPPROPRIATION OF CONFIDENTIAL INFORMATION
(Against All Defendants)

128.    Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

129.    Defendants were familiar with and given access to Summer's confidential and proprietary information, intellectual property, trade secrets, and business, branding and

marketing strategies owned by Summer, including but not limited to ██████████████

██████

130.   The ███████████████ is confidential and proprietary business

information.

131.   Defendants have carried away, converted to their own use, disclosed to

third parties and/or threatened to use such confidential and proprietary information, intellectual

property, trade secrets, and business, branding and marketing strategies to their benefit and to the

benefit of the New Startup and to the direct detriment of Summer.  This information includes, but

is not limited to:  any products or technologies incorporating work performed for Summer by

Rest pursuant to the Consulting Agreement (said products including but not limited to: ████████



132.   As a direct and proximate result of Defendants' conduct, Summer has

suffered and will continue to suffer irreparable harm.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
(Against Bramson, Dooley and Price)

133.   Summer repeats and realleges the allegations contained in all prior

paragraphs of this Complaint as if each were fully set forth herein.

134.   Bramson, Dooley and Price, as a director, officer or executive of Summer,

owe a fiduciary duty to Summer not to disclose confidential and proprietary information both

during their employment and after the term of their employment and not to misappropriate and

convert Summer's confidential and proprietary information, intellectual property, trade secrets, and business, branding and marketing strategies for their own self profit or interest.

135.   Bramson's, Dooley's and Price's conduct of misappropriating and converting Summer's trade secrets and proprietary information to establish a competing company to the detriment of Summer constitutes a breach of their fiduciary duties.

136.   As a direct and proximate result of Bramson's, Dooley's and Price's conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT IV
## CONVERSION
(Against All Defendants)

137.   Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

138.   Defendants' actions in stealing information and documents, whether confidential, proprietary or otherwise, rightfully belonging to Summer constitute conversion of Summer's property.

139.   As a direct and proximate result of Defendants' conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT V
## BREACH OF CONTRACT: BRAMSON AGREEMENT
(Against Bramson)

140.   Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

141.   The Bramson Agreement is a valid and enforceable contract.

142.   Summer has performed all of its obligations under the Bramson Agreement.

143.   Bramson has violated the terms of the Bramson Agreement.

144.     Bramson agreed in the Bramson Agreement that a violation of the non-disclosure provisions of the Bramson Agreement would constitute irreparable harm.

145.     As a direct and proximate result of Bramson's conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT VI
## BREACH OF CONTRACT: DOOLEY AGREEMENT
### (Against Dooley)

146.     Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

147.     The Dooley Agreement is a valid and enforceable contract.

148.     Summer has performed all of its obligations under the Dooley Agreement.

149.     Dooley has violated the terms of the Dooley Agreement.

150.     Dooley agreed in the Dooley Agreement that a violation of the non-disclosure provisions of the Dooley Agreement would constitute irreparable harm.

151.     As a direct and proximate result of Dooley's conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT VII
## BREACH OF CONTRACT: PRICE AGREEMENT
### (Against Price)

152.     Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

153.     The Price Agreement is a valid and enforceable contract.

154.     Summer has performed all of its obligations under the Price Agreement.

155.     Price has violated the terms of the Price Agreement.

156.     Price agreed in the Price Agreement that a violation of the non-disclosure provisions of the Price Agreement would constitute irreparable harm.

157.    As a direct and proximate result of Price's conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT VIII
## TORTIOUS INTERFERENCE WITH EMPLOYMENT AGREEMENTS
(Against All Defendants)

158.    Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

159.    Defendants are aware of, and at all times have been aware of, the nature of Summer's employment agreements with Bramson, Dooley and Price.

160.    The threats and/or actions of Defendants in misappropriating and converting Summer's trade secrets and proprietary information, and the threats and/or actions of Defendants in attempting to convince Summer employees to leave Summer's employ constitute a tortious interference with contractual and prospective contractual relationships.

161.    As a direct and proximate result of Defendants' conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT IX
## TORTIOUS INTERFERENCE WITH CONSULTING AGREEMENT
(Against All Defendants)

162.    Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

163.    Defendants are aware of, and at all times have been aware of Summer's contractual relationship with Rest.

164.    The threats and/or actions of Defendants in misappropriating and converting Summer's trade secrets and proprietary information constitute a tortious interference with contractual and prospective contractual relationships.

165.    As a direct and proximate result of Defendants' conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT X
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
(Against All Defendants)

166.    Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

167.    Defendants are aware of, and at all times have been aware of Summer's prospective business relationships.

168.    The threats and/or actions of Defendants in misappropriating and converting Summer's trade secrets and proprietary information constitute a tortious interference with contractual and prospective contractual relationships.

169.    As a direct and proximate result of Defendants' conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT XI
## COMPUTER THEFT UNDER RI GEN. LAWS §§ 11-52-4 AND 11-52-6(A)
(Against All Defendants)

170.    Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

171.    On behalf of all Defendants, Bramson, Dooley and Price intentionally and without claim of right accessed, transferred, and took data contained on Summer's computer system, which belonged to Summer, in violation of Rhode Island General Laws § 11-52-4.

172.    The data that Bramson, Dooley and Price unlawfully accessed have a value in excess of $500.

173.    As a direct and proximate result of Bramson's, Dooley's and Price's unlawful conduct, Summer has suffered and will continue to suffer irreparable harm.

### COUNT XII
### COMPUTER TRESPASS UNDER RI GEN. LAWS §§ 11-52-4.1 AND 11-52-6(A)
(Against Bramson, Dooley and Price)

174.   Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

175.   Bramson, Dooley and Price used Summer's computers without authority and with the intent to make or cause to be made unauthorized copies of data residing therein and within Summer's computer network, in violation of Rhode Island General Laws § 11-52-4.1(6).

176.   As a direct and proximate result of Bramson's, Dooley's and Price's unlawful conduct, Summer has suffered and will continue to suffer irreparable harm.

### COUNT XIII
### ACCESS TO COMPUTER FOR FRAUDULENT PURPOSE
### UNDER RI GEN. LAWS §§ 11-52-2 AND 11-52-6(A)
(Against All Defendants)

177.   Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

178.   On behalf of all Defendants, Bramson, Dooley and Price accessed or caused to be accessed Summer's computer system for the purpose of devising or executing a scheme to defraud Summer, in violation of Rhode Island General Laws § 11-52-2.

179.   As a direct and proximate result of Bramson's, Dooley's and Price's unlawful conduct, Summer has suffered and will continue to suffer irreparable harm.

### COUNT XIV
### INTENTIONAL ACCESS, ALTERATION, DAMAGE OR DESTRUCTION
### UNDER RI GEN. LAWS §§ 11-52-3 AND 11-52-6(A)
(Against All Defendants)

180.   Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

181.    On behalf of all Defendants, Bramson, Dooley and Price intentionally accessed Summer's computer system and Summer's confidential and proprietary information without authorization for the purpose of engaging in a fraudulent or other illegal purpose, in violation of Rhode Island General Laws § 11-52-3.

182.    As a direct and proximate result of Bramson's, Dooley's and Price's unlawful conduct, Summer has suffered and will continue to suffer irreparable harm.

## COUNT XV
## UNJUST ENRICHMENT
(Against All Defendants)

183.    Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

184.    During the terms of their employment agreements or the Consulting Agreement, Defendants received compensation for their services and as a result received the full benefit of their employment or consulting relationship with Summer.

185.    As a result of their wrongful conduct, Defendants will receive additional compensation and value from the New Startup that rightfully belongs to Summer.

186.    As a direct and proximate result of Defendants' conduct, Defendants will be unjustly enriched.

## COUNT XVI
## CIVIL CONSPIRACY
(Against All Defendants)

187.    Summer repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if each were fully set forth herein.

188.    All of the Defendants entered into an agreement with each other, among others, for the unlawful purpose of taking, misappropriating and converting Summer's confidential information, proprietary business processes, models, methodologies and strategies

relating to the ███████████████ As part of this plan, Defendants agreed to, among other things, breach their respective Agreements, use and exploit Summer's confidential information for their own benefit, unjustly enrich themselves at Summer's expense, damage Summer's business and unfairly compete with Summer.

189.    Defendants each knew of the plan and its purpose, and acted in concert to use and exploit Summer's confidential and proprietary information for their own benefit.

190.    Defendants acted in their individual capacities as well as their capacities as officers, directors or employees of the New Startup.

191.    This conspiracy was a combination of two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.

192.    As a result of Defendants' unlawful conspiracy, Summer has suffered and will continue to suffer irreparable harm.

WHEREFORE, Summer demands judgment as follows:

A.    That the Defendants and all persons acting in concert with them be temporarily restrained, and preliminary and permanently enjoined, from using or disclosing any of Summer's confidential and proprietary information, intellectual property, trade secrets, business strategies, branding strategies, marketing strategies or technologies, including but not limited to any products or technologies incorporating work performed for Summer by Rest pursuant to the Consulting Agreement (said products including but not limited to: ████████████████████



B.   That the Defendants and all persons acting in concert with them be temporarily restrained, and preliminarily and permanently enjoined, from destroying, discarding or altering, directly or indirectly, any of Summer's confidential and proprietary information or documents in any way concerning the subject matter of this Complaint;

C.   That the Defendants and all persons acting in concert with them be temporarily restrained, and preliminarily and permanently enjoined, from soliciting or communicating with Summer employees to induce or encourage the employee to leave Summer's employ;

D.   That the Defendants and all persons acting in concert with them be required to immediately return to Summer all originals and all copies of any of Summer's confidential and proprietary information that may exist, in any form, in their possession, custody or control;

E.   That Summer be awarded compensatory damages in an amount to be determined at trial;

F.   That Summer be awarded punitive damages in an amount to be determined at trial;

G.   That Summer be awarded its costs and attorneys' fees and expenses incurred in this action; and

H.   That this Court award such other and further relief as it deems fit and

proper.

### JURY TRIAL DEMAND

Summer demands a trial by jury on all claims so triable.

DATED:  May 27, 2015

**OF COUNSEL:**

Jonathan J. Lerner
Michael H. Gruenglas
Maura Barry Grinalds
Christopher G. Clark
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000

Respectfully submitted,

SUMMER INFANT, INC.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

  /s/ Paul M. Kessimian
Paul M. Kessimian (#7127)
Michael A. Gamboli (#4684)
Cale P. Keable (#6982)
40 Westminster Street, Suite 1100
Providence, RI 02903
(401) 861-8200
(401) 861-8210 (FAX)
pk@psh.com; mag@psh.com; cpk@psh.com